Baldwin, J.
If the bond from Roscow Cole to his daughter could be regarded as a covenant or agreement in consideration of marriage, a question would arise, whether it was void as to creditors under the second section of our registry law, 1 Rev. Code , providing that covenants or agreements made in consideration of marriage, shall be admitted to record in the county where the land charged lieth, or if none, where the personal estate, settled or covenanted, or agreed to be paid or settled, shall remain: and if void within the meaning of the statute, then another question would occur, whether it furnished a sufficient consideration for the deeds afterwards made to secure it. But I waive the consideration of these questions, being clearly of opinion that the bond cannot be treated as a covenant or agreement made in consideration of marriage.
Marriage furnishes a valuable consideration for an agreement, as much so as money paid or agreed to be paid; and the consideration arises in a contract made, in contemplation of a specific marriage, between the parties to the intended union, or between one or both of them, and a third person who has reason to desire their intermarriage. If such third person promises or agrees, in the event of such intermarriage, to convey or settle, or pay, property or money, to or for the parties to the marriage tie, or either of them, then the occurrence of the marriage is a sufficient consideration for such promise or agreement; the law presuming that the latter was an inducement to the performance of the solemn and irrevocable specific act which it contemplated. In such a contract, the law recognizes mutuality both of promise and consideration. It is quite otherwise where no specific marriage is in treaty or contemplated, and the promise is in reference to a future possible state or condition of matrimony. As where a father promises a daughter, that if at any after period of life, she shall choose to enter into wedlock, he will in that event, *653 and upon its occurrence, give, convey or pay to her specified money or property. In such a case, there is no mutuality either of promise or consideration. The agreement of the father is founded upon no undertaking or promise of the daughter, and upon no valuable consideration, but is merely for a future contingent advancement of the daughter. It is not in the eye of the law in consideration of marriage, but of natural love and affection.
The import of the consideration of marriage, is the same in our registry law as in the statute against frauds and perjuries, and its signification in the latter, is derived from the common law doctrine in actions founded upon parol promises or agreements. The consideration of natural love and affection, is of no efficacy in such actions, a promise or agreement by parol, for which there is no other consideration, being merely nudum pactum. It was necessary, therefore, before the statute of frauds, as it still is, to prove in such actions a valuable consideration, and the early cases are numerous in which marriage was held to be such. The cases are collected in Comy, on Contr. 11, 457, 458, 459; and it will be found upon examination, that they all have reference to a promise or agreement, in consideration of a contemplated union, made by a parent or other relative of one of the parties, and a communication made to them, or one of them, upon the treaty of marriage. No case can be found in which a promise in reference merely to a future condition of wedlock has been treated as one made in consideration of marriage. The evils arising out of actions founded upon parol promises or agreements, in consideration of marriage, though thus restricted, gave rise to the provision of the statute of frauds, that no action shall be brought to charge any person upon any agreement made upon consideration of marriage, unless the promise or agreement upon which such action shall be brought, or some memorandum or *654 note thereof, shall be in writing, and signed by the party to be charged therewith, or some other person by him thereunto lawfully authorized. Under this statute, such written contracts were obligatory not only between the parties, but also against creditors and purchasers. But the provision in our registry law above noticed, requires them to be recorded, as to creditors and purchasers, without notice.
The obligation in question, is in the penalty of 100,000 dollars, conditioned for payment to the obligee, on the day of her marriage, of 50,000 dollars in good bonds or other property, for the benefit of herself and children, and free from the control of her husband. It was not made in contemplation of any particular marriage, or during any treaty of that kind, hut on the contrary, on the very day that an engagement to marry had been broken off, and the delivery of it was accompanied with a letter from the obligor, stating it to be a Christmas gift. It was, by the terms of the instrument, to fall due on the day of her entering into the state of wedlock, and was, therefore, contingent upon that event; hut this was a condition, and not a consideration within the meaning of the statute.
The bond must, therefore, he treated as a voluntary obligation, for the meritorious consideration of a provision by the father for his child; and so regarded, our registry law does not embrace it; covenants or agreements in consideration of marriage, being the only executory contracts which that law requires to be recorded.
This voluntary bond was good and valid between the parties, for though a parol promise of such a nature would be nudum pactum, it is otherwise in relation to a sealed instrument, which, from the solemnity of its character, carries with it, as inherent therein, a consideration deemed valuable in the eye of the law.
The bond was executed on the 25th of December 1830, and the event upon which it became payable, to *655 wit, the marriage of the obligee, occurred on the 11th of March 1834. At its date, and also at the time it fell due, and for some time afterwards, the obligor was, as appears from the evidence, a man of great wealth, and worth three times the amount of the provision for his daughter, who was his only child. There is no evidence of any specific debt owing by him during the whole time, and there is no reason to believe that any which he may have then owed remains unsatisfied.
In the year 1835, Roscow Cole removed to the City of New York, where he engaged in business, and after-wards failed; and on the 8th of April 1837, he executed a deed, by which he conveyed to John A. Mackinder certain real estate and debts in Virginia, upon trust, to sell the real estate and collect the debts, and hold in his own hands the sum of 50,000 dollars, with interest from the 11th of March 1834, for the benefit of Mrs. Hamilton, the grantor’s daughter; and to pay the interest thereof to her, from time to time as it should accrue, on her own receipt, and to divide the principal sum equally amongst her children, should she have any child or children surviving her, and if none, then to pay the same to her right heirs. And on the 19th of the same month, by another deed appended to the former, the same grantor conveyed to the same trustee, certain slaves in the State of Virginia, upon trust to cause the same to be appraised, and thereupon to endorse the appraised value upon the bond above mentioned, as part payment of the principal or interest due thereon, as the case should be, and to hold the slaves thereafter as her trust property.
The appellant claiming as creditor at large of Roscow Cole, upon an indebtedness which accrued in March 1837, brought this suit, by way of foreign attachment, in October of that year, to subject the property and funds conveyed by the above mentioned deeds of April and July 1837, and impeaching those deeds as fraudulent in regard to the creditors of Cole.
*656 If those deeds can, in the provisions made for the benefit of Mrs. Hamilton, be regarded as voluntary, then they must be treated as fraudulent against the creditors of Cole, the grantor being at the time of the execution thereof, in embarrassed and insolvent circumstances. But it is otherwise if they were founded upon a sufficient consideration.
There is no reason to believe that the bond which formed the consideration of the deeds, was made with any fraudulent intent. All idea of fraud as to creditors then existing, is repelled by the circumstances of the case, the obligor being then affluent and unembarrassed, and having contracted no liabilities that remain unsatisfied. Nor is any motive perceived for a design to defraud future creditors. The purpose seems to have been a contingent future advancement by a wealthy father, in favour of his only child, in lieu of an immediate provision of the like amount, prevented by the disappointment of nuptials expected to have been solemnized on the same day. Whether the contingent nature of such an obligation would warrant a presumption of fraud, as to debts contracted before the happening of the contingency, is a question-which may be well worthy of consideration whenever it occurs. But it has no application to the present case; for here the wealth of the father, and his freedom from embarrassment, still continued when the marriage of the daughter took place; and we hear of no complaints from intervening creditors.
It cannot be doubted, if upon the marriage of Miss Cole, her father had performed the condition of his bond, by'paying, conveying or settling the amount stipulated, that the transaction would have been unimpeachable by subsequent creditors. Nothing is better established, than that a postnuptial settlement, though voluntary, in favour of a wife or child, by a person not indebted at the time, is valid against subsequent creditors. 2 Kent’s Comm. 145.
*657 It is equally clear, that after the marriage of the obligee, the condition of the bond was broken by the failure of the obligor to comply with its stipulations ; and that he was liable in an action at law to the recovery of the sum specified, and the enforcement of the judgment by process of execution. Nor would equity give relief against such a judgment, in behalf of the obligor or his representative, or any creditor whose demand arose after the breach of the condition.
It follows, that by the breach of the condition of the obligation, Mrs. Hamilton became the creditor of her father, and the transaction being free from fraud, it was competent for him to give her a preference over his other creditors, which he did by the deeds in question, providing, as far as circumstances permitted, for the satisfaction of her demand.
It is well settled, that a voluntary obligation, upon which a cause of action has accrued, may furnish a valuable consideration for a new contract, security or conveyance.
In Stiles v. The Attorney General, 2 Atk. R. 152, certain real estates of the Duke of Wharton had been sold at the suit of judgment creditors, who were satisfied out of the proceeds, leaving a residue, which his bond creditors sought to subject, to the exclusion of Dr. Young, to whom two annuities had been granted by the Duke, and charged upon the estates. The first annuity was purely voluntary, being in consideration of the efforts of the grantee in the promotion of learning and the polite arts, and the friendship of the grantor for him; and the second was in part for arrears which accrued upon the first, and in part for another consideration deemed valuable. And it was held by Lord Hardwicke, that for the annuities, Dr. Young should be preferred to the bond creditors; his lordship saying, “ though the grant of the first annuity may be voluntary, taken singly, yet the recital in the second, will *658 alter the nature of it, and turn it into a valuable consideration: for as there were arrears on the first, there is no doubt this was a just and lawful debt, and the promising not to sue for these arrears, [which it seems from the report of the case was a mere presumption,] was a good consideration, and from that time the first annuity ceased to be a voluntary grant.”
In Gilham v. Locke, 9 Ves. R. 613, the bill was filed by assignees of a bankrupt, under the following circumstances : Some time after the marriage of the bankrupt with the defendant, it was discovered that he had, at the time of contracting that marriage, a wife living; and to make the defendant some compensation, he gave her a bond to secure to her an annuity of £ 40 for her life, and the sum of £ 500 in case she should survive him. The annuity being three years in arrear, he assigned to her some leasehold premises, in consideration of £ 330, of which the arrear of £ 120 was part. Sir William Grant, master of the rolls, held that the bond, notwithstanding the moral obligation to make compensation, must be considered as voluntary against creditors, as much so as a postnuptial settlement for a wife and children. But he, notwithstanding, dismissed the bill, and said: “ Here were arrears due upon this annuity. The question is, whether a transaction, upon arrears grown due under a voluntary bond, may not be a transaction for valuable consideration. In the case of the Duke of Wharton, who gave a voluntary bond to Dr. Young; it fell into arrear; and a new bond was given for the arrears, and that was supported against creditors. The question is, if this defendant has got a security for the arrears due, whether she is not entitled to hold it. By the subsequent arrangement, the arrears were satisfied in that way; for which, otherwise she might have sued. I will look into that case, but I do not see how it can be distinguished in principle.” And at a subsequent day, his honour said: “ The case to *659 which I alluded, Stiles v. The Attorney General, supports the opinion I gave : and upon principle it must be so ; for the instant the arrears accrue, they are as between the obligor and obligee, a debt for which the obligor might immediately be sued : and being a debt, and as sufficient as a debt for valuable consideration, it may be dealt with as such; and any transaction, therefore, founded upon that, will be for valuable consideration. If a bond is given for the arrears, it is a bond for valuable consideration. So, if the arrears are given up, and something is given in lieu of them, as in this case, where they were part of the consideration for the assignment of the lease, which so far is for valuable consideration.”
In Tanner v. Byne, 2 Cond. Eng. Ch. R. 82, a husband, in November 1793, made a postnuptial settlement of £4000 in favour of his wife and children; and in November 1796, in consideration of the £ 4000, expressed to have been lent to him by the trustees of the settlement, made a mortgage to them of real estate to secure that sum, and covenanted to repay it. The husband never in fact paid the £ 4000 to the trustees, and the title to the mortgaged subject failed. In a suit brought by a creditor of the husband after his decease, to have his personal estate applied to the payment of his debts, the master reported the trustees as specialty creditors for the £ 4000 and interest, and his report was excepted to, on the ground that the deeds upon which the claim was founded, were voluntary, and not supported by any good or valuable consideration. But it was held that the trustees were specialty creditors of the husband, and to be paid in preference to his simple contract creditors. And the master of the rolls said: “If the £ 4000 had been in fact paid by the intestate to the trustees, it is not to be disputed that, although the settlement of November 1793, was subsequent to the marriage and merely voluntary, the master’s finding would *660 have been fully justified; and the trustees, having lent the money to the intestate, would have been duly constituted specialty creditors by the indenture of November 1796. But it is contended, that the money not having been in fact paid by the intestate to the trustees, the second indenture is to be considered, like the first, as purely voluntary, and constituting no debt in competition with the creditors. It appears to me, the transaction is substantially the same as if the £ 4000 had been actually paid by the intestate, and then restored to him by way of loan.”
It seems to me, therefore, that the deeds in question were founded upon a sufficient consideration, which had accrued and been ripened into a lawful debt before the appellant’s demand had any existence; and that whether . they be treated as assignments, securities or conveyances, they transferred both the legal and equitable title of the subjects thereof, for the benefit of the cestuis que trust; and that there is no ground upon which they have been successfully impeached, unless indeed it has been shewn that they are void, under our registry law, against creditors of the grantor, for want of due admission to record.
Our registry law provides, that “ any deed may be admitted to record, upon the certificate under seal of any two justices of the peace for any county or corporation within the United States, or any territory thereof, or within the District of Columbia, annexed to such deed, and to the following effect, to wit, ‘ county, (or corporation,) to wit, We, A. B. and C. D. justices of the peace in the county (or corporation) aforesaid, in the State (or Territory or District) of , do hereby certify’ ” &c. Such certificate, it will be seen, with the signatures and seals of the acting justices, is the only authentication required of their authority and its exercise, and must therefore be deemed sufficient.
*661 Justices of the peace are a class of official persons known to the English and American law, with subordinate judicial powers in pais, including the preservation of the peace. The mode of their appointment, the tenure of their office, the precise nature and extent of their official functions, both judicial and ministerial, even their appellative designation, must of course, in the several States and Territories of the Union, be governed by the municipal laws there prevailing; and are circumstances not regarded by our statute. It is enough, if the general scope and nature of their powers be in some degree, those of the general class to which they belong. We know that in Virginia, justices of the peace of our cities and corporate towns are appointed and known, and designate themselves in their official acts, by the appellation of aldermen. This we also know, as a historical fact, to be usually, if not universally, true in reference to justices of the peace of the cities and corporate towns of the other States and Territories. The presumption is thus warranted, that aldermen of a city or corporate town, in any part of our confederacy, are justices of the peace, when they undertake to act as such under the authority of our statute ; and it is a presumption so strong and satisfactory, and the mischiefs of disregarding it are so manifest, that the party who resists the conclusion, must adduce proof to the contrary. This has not been done in the present case, but on the other hand, the proof furnished by a copy of the charter of the City of New York, is directly the reverse.
It will be seen that our statute in nowise requires that the persons receiving and certifying the acknowledgment of the deed, shall be designated in the laws of the State or Territory in which they act by the appellation of justices of the peace. It is sufficient if they belong to that class. Nor does the act require that the form of the certificate which it gives, should be literally *662 pursued. It is enough if the facts be certified in substance and effect; which has been done in the present case, the certificate shewing that the acknowledgment was made before, and certified by, two aldermen of the City New York.
. I think the decree of the Circuit court ought to be affirmed.
Brooke and Daniel, J’s, concurred in affirming the decree.
Allen, J. dissented.